NEW YORK COUNTY.—HON. D. C. CALVIN, SURROGATE.—
August, 1880.

## STEIN *v.* WILZINSKI.

*In the matter of the probate of the last will and testament of* JOHANNA BAUM.

Where the testatrix, a German, was able to speak broken English, and one of the subscribing witnesses testifies that he was unacquainted with German, that he asked the decedent in English whether the instrument was her last will, and she answered "Ja," in German, and that he had previously been requested by the decedent to become a witness to her will, *Held*, to be a sufficient request to sign as a witness and a sufficient publication of the will.

*It seems*, that the subscription as a witness to the will by a person who is unable to understand the testator, or make himself understood by him, and to whom the declaration and request of the testator must be translated, is not a compliance with the statute.

The circumstance that the instructions for drawing the will are given by the chief beneficiary thereunder, with whom the testatrix, a woman ninety years of age, was living at the time, will not invalidate the will, where it appears that it was agreed between testatrix, her husband and the beneficiary, that, upon the death of the husband, the testatrix should live with the beneficiary, and upon the death of testatrix her property should go the beneficiary ; that in pursuance of this agreement testatrix became and remained an inmate of the beneficiary's family for ten years; that prior to the execution of the will testatrix had frequently stated that she intended to leave her property to the beneficiary, and that the will was read and explained to testatrix by one of the subscribing witnesses before execution of the same.

ʼAPPLICATION for the probate of the will of Johanna Baum. The instrument propounded was dated March 19, 1880, signed by decedent by her mark, and witnessed by Ellis Morris and George S. Dubois. It gives to Caroline Wilzinski all her estate, except $100 to Clara Coppenheim, and one feather bed and pillow, and appointed said Caroline executrix, and directed payment of her

debts and the erection of a suitable monument over her remains.

Jacob Stern and Barbette Kohlmeyer, as next of kin, filed objections to the probate; that the instrument was not decedent's will; that she was not of sound mind or memory; that it was not executed according to law; that it was procured by fraud and undue influence.

Ellis Morris, one of the subscribing witnesses, being duly sworn, testified that he knew decedent nearly a year before her death; that he called upon her at her room, when she handed him the paper propounded, said it was her will, and she wanted to sign it in his presence; that the instrument was in English and she requested him to translate it to her, which he did by giving her a synopsis of it. She asked if by signing it the bequest would be guaranteed to the parties after her death. Witness answered yes, and decedent made her mark to it, in the presence of the witnesses; that he translated it into German, which she understood; that she had been living with the beneficiary eleven years, who had attended to her wants, and she thought it her duty to leave what she had to her; she said she was over ninety years old, and remembered Napoleon going into the country where she lived, and spoke of several young men who left for the war and never returned; that she appeared intelligent.

On cross-examination, he testified that the will was executed at Mr. Wilzinski's house; that he was invited to go there by Mr. Wilzinski; that he was called as a witness at the date of its execution, about 8 o'clock in the evening; that he was told decedent wanted to see him, and went to the room and found her in bed; that she took the will from the pillow or behind the bed, and said

she wanted him to see her sign her will—in German; that she could not talk English; that her mental condition was good; that no other persons than decedent and the witnesses were present. She said she could not write, and made her mark; that she was able to sit up; that he thought the other witness read the paper; that he did not know whether Dubois was requested to sign or not; that decedent called the instrument a testament—in German. Witness told Dubois in English what she said, and told him decedent wanted him to sign the paper.

George S. Dubois, the other subscribing witness, being sworn, testified that he knew decedent quite well for over three years; that she spoke broken, but he could understand a great deal she said; that in the evening he was sent for and he went, and found Wilzinski and family there, who told witness decedent wanted to see him. He went up to her room, when Mr. Morris read and explained the will and she said it was as she wanted it, and asked him to sign it; that she had spoken to him about it before; that Mr. Morris asked her in German if she wanted him to witness the will; that she spoke of having lived with Mrs. Wilzinski, and she wanted her to get that; that she appeared to be intelligent and clear-minded.

On cross-examination, he testified that he did not remember the month or day when this occurred; that it was about 8 o'clock in the evening, and Mr. Wilzinski came for him; witness did not understand German; that he did not understand what she said to Mr. Morris, except as he interpreted it.

On re-direct examination, he testified that decedent talked broken English a little; that he read the paper before he signed it; that he spoke to her in English and

she said "Yah," and appeared to understand it; that he could not have told what the paper was if he had not read it; that witness asked decedent in English if it was her will, and she said "Yah," and that Mr. Morris asked her if that was her testament, and she said "Yah;" that "Johanna Baum, her mark," was written by Mr. Morris.

The witness Morris, being recalled, testified that the figures 19 and March and 1880 were in his handwriting, and on re-cross-examination, he testified that he made the erasure and alteration a minute or two before signing, in the presence of Dubois; that he made the change without anybody's suggesting it.

Here the proponent rested, and the contestants called Max M. Sterne, who testified that he knew decedent, and thought her weak-minded because she asked him to dance with her, and take her to balls; that she had a poor memory, and wandered in her conversation; and that she said she would leave the principal part of her property to Rose Kohlmeyer.

Rosa Deuzer, sworn for contestants, testified that she knew decedent. She didn't know her age, but thought she was about one hundred; that for the last five years witness thought her weak and absent-minded, and that she told her she would like to be a child again; that she was forgetful, and said she would give a part of her money to Rose Kohlmeyer.

Mrs. Clara Coppenheimer, sworn for contestants, testified that decedent often visited her for two or three weeks at a time; she came whenever she was sick, and she said witness was her only friend; that she was forgetful and afflicted with dropsy; she told her she would not forget

her; that she would leave something to Mrs. Wilzinski and Rosa, and that she liked Rosa; that while sick at Mrs. Wilzinski's, the latter asked her to have a nurse, and she declined on account of the cost, so Mrs. Wilzinski hired and paid the nurse; that witness expected to get $150, and that decedent told her she didn't like to make a will, because she didn't know how long she should be sick, or how much money she would need.

Mrs. Babette Kohlmeyer, sworn for contestants, testified that Rose Kohlmeyer was her daughter and decedent her aunt; that she sometimes visited her in the last year of her life; that her memory was not good. She would lay things down and forget where she laid them; that she often said she would leave something to Rosa; a few days before her death she visited her at Mrs. Wilzinski's and she didn't recognize her at first, but did when told who she was.

The contestants here rested, and the proponents called Mrs. Caroline Wilzinski, who, being sworn, testified that decedent was a cousin of her father; that decedent's husband, before his death, asked witness if she would take care of his wife, and witness said she would, and that she lived with her for the last ten years of her life; that she told witness she didn't want any of her relatives to have anything, except Mrs. Coppenheimer, and that when they called not to let them in.

On cross-examination, she testified that she complained of asthma the last year; that she spoke of making a will; witness was not present when it was executed; that it was made before decedent took to her bed, and she wanted it read in German, because she didn't understand English, and she was afraid of trouble; that she was last

out of the house about six weeks before her death, and
went to the bank with witness; that she told witness she
had made the will the day after it was made, which was
before she went to the bank, and a couple of weeks be-
fore she took to her bed; that she was deaf and restless
at night; that her memory was good; that she didn't
know who drew the will, except decedent told her wit-
ness's son did, and that witness should get a German
and American as witnesses, for there would be trouble;
that decedent paid most of her bills for medicine her-
self; that she gave witness $300 four or five years ago.

On re-direct-examination, she testified, and that after-
wards she said she didn't know but she should need the
money, and witness's husband gave her his note for it;
that witness's son Lewis read the will to her; that a note
was given when the money was, and she tore it up, but
afterwards asked for another.

Mrs. Rebecca Lichtenberg, sworn for proponent, testi-
fied that she knew decedent over thirty years; that
about two weeks before her death she called upon her,
and she inquired where witness lived, and if she was the
person who once lived in Grand street; witness said yes,
and decedent said witness's husband was once on the
police, and that her husband was on the police thirty-two
years before; and that she remembered witness's child,
who was then two and a half years old; and that she
called upon her two hours before she died, and she rec-
ognized her and called her by name; that a week before
she spoke of wishing to see witness's daughter, and the
clothes she had on when she had a picture taken.

Mrs. Caroline Braun, sworn for proponent, testified
that she knew decedent; that decedent told her that

she was taken in charge by Mrs. Wilzinski at her husband's death, and whatever she had at her death was to go to her ; that her mind was perfectly clear.

On cross-examination, she testified that decedent told her this several times, about two years before her death ; that she said this conversation had taken place between her husband and herself and Mrs. Wilzinski.

Bridget Ryan, sworn for proponent, testified that she was a servant in Mrs. Wilzinski's house and knew decedent, and that she had a good strong memory, and told witness that all she had was to go to Mrs. Wilzinski.

On cross-examination, she testified that she waited upon decedent; she told witness that her husband said, before his death, she should live with Mrs. Wilzinski, and that all she had should go to her ; that she said this about five months before her death.

Henry Wilzinski, sworn for proponent, testified that he was the son of Mrs. Wilzinski, the principal legatee, and that he had frequently heard decedent say that when she died all she had would go to his mother.

On cross-examination, he testified that he was an attorney and drew the will; that his mother told him decedent desired him to do so ; that he asked his mother to ask decedent how she wanted it, and she went, and returned and told him, and he drew a draft in lead pencil, and was afterwards told that she desired a clause providing for the erection of a tombstone ; and witness left the paper, saying one of the boys might write it out and decedent execute it; that he never saw it afterwards, and never saw the will till after her death, which is a copy of the draft he drew ; that she had before spoken to

him to draw her will; that his brother drew the will, who resided with his father.

Probate of the will was granted.

HENRY H. WILZINSKI, *for proponent.*

TOWNLEY & WOLF, *for contestant.*

THE SURROGATE.—There are but two questions to be considered, as the result of this testimony. The first is whether the subscription to the will by the witness Dubois, unable to understand German, and to whom the declaration and request of the testatrix had to be translated by the other subscribing witness, was a compliance with the statute. The object of requiring two subscribing witnesses is undoubtedly to guard against imposition upon, or mistake of, the testator, and in a case where one of the witnesses must depend upon the statement of the other as to what is said by the testator, he would appear to be a witness only as to the act of signing, and if that were literally true in this case, I should certainly hesitate in holding it sufficient proof.

Suppose, for example, both subscribing witnesses had been incapable of understanding a word of what the decedent said, and an interpreter had stated to them, respectively, that the decedent declared to them that the instrument was her last will and testament, and that she requested them to subscribe their names as witnesses thereto. They would have no assurance of the fact, except the statement of the interpreter, and the verity of the act would seem to be entirely dependent upon his testimony, as to the truthful interpretation. And it seems to me that it would fall short, altogether, of the

proof of the material facts required by the statute, and that those declarations, thus interpreted to two witnesses, would add nothing to a like interpretation to one. But in this case, the decedent did understand and speak some English, and the witness, Dubois, swears that the inquiry was made by him, of the decedent, in English, if the instrument was her last will, and she answered "Ja," and that when the other witness appeared to ask the question in German, she answered in the same way; and that in the question the other witness used the word testament, and that he had been theretofore requested to become a witness to her will by decedent. Under this proof I am inclined to hold the will to have been duly executed.

The second is whether the testimony of the proponent's counsel is sufficient to justify its rejection, on the ground that the instructions were received through the principal beneficiary, there being no satisfactory proof that the decedent ever gave any such instructions.

It has been held, in repeated cases, that where a person, occupying a fiduciary relation to the testator, receives a legacy, and has a controlling agency to the execution of the will, the circumstances are deemed suspicious, requiring the fullest explanation, such as proof of capacity and free exercise of voluntary choice. (1 *Redf. on Wills*, 515, &c.; *Id.*, 122.)

But if this will came within the definition of an inofficious testament, it seems to be relieved from suspicion by the fact, well proved, that there was an understanding between decedent, the principal beneficiary, and the testatrix's husband, before his death, that after his death decedent should become a member of the

Wilzinski family, and that Mrs. Wilzinski should have the property at the death of the testatrix; that, in pursuance of this agreement, testatrix became and remained an inmate of the Wilzinski's for about ten years; that she had repeatedly stated, before the execution of the instrument propounded, that she intended to give the most of her estate to Mrs. Wilzinski, and that, in the absence of the principal beneficiary, Mr. Morris carefully translated the will to her, and that she understood its terms.

But while the civil law defines an inofficious or undutiful will to be such as substantially departs from the disposition of the estate, as it would be distributed in case of intestacy, I am of the opinion that such a definition is entirely inconsistent with the law of wills, as recognized and established in this country. For the authority to make a will implies the power to discriminate between, or disinherit, next-of-kin; and the fact of such disinheritance or discrimination raises no presumption of undue influence.

I am of the opinion that the instrument propounded is proved to have been executed in conformity to the statutes of this state, by the decedent, when she was of sound and disposing mind, free from restraint, and should therefore be admitted to probate.

Ordered accordingly.